IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CR-126-PLR-DCP |
| | ) | |
| CHAD RUTHERFORD, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter is before the Court upon Defendant Rutherford's Motion to Suppress [Doc. 17], filed on November 27, 2019, as well as Defendant's Memorandum in Support [Doc. 21], filed on December 23, 2019. The Government filed a response in opposition to the motion [Doc. 22] on January 13, 2020.

An evidentiary hearing was held on Defendant's Motion to Suppress [Doc. 17] on January 29, 2020. [Doc. 24]. Assistant United States Attorney Alan Kirk, as well as Extern Tippany Patrick, appeared on behalf of the Government. Attorney Russell Greene represented Defendant Rutherford, who was also present. After hearing the arguments of counsel, the Court took the motion under advisement.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress [Doc. 17] be denied.

# I. POSITIONS OF THE PARTIES

Defendant is charged [Doc. 1] with the possession with intent to distribute fifty (50) grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance (Count 1), possession of a firearm in furtherance of a drug trafficking crime (Count 2), and possession of a firearm by a convicted felon (Count 3). These charges arise out of a warrantless search and seizure of Defendant's vehicle on April 15, 2019.

Defendant seeks [Doc. 17] to suppress all evidence seized from the alleged illegal detention and search of his vehicle. Defendant asserts that law enforcement executed an unreasonable and illegal detention of his vehicle, as there no was reasonable suspicion of criminal activity present. Further, Defendant maintains that the warrantless search of his vehicle was unconstitutional because law enforcement failed to articulate any probable cause that evidence of a crime or contraband would be found in the vehicle. Therefore, Defendant contends that law enforcement should have obtained a warrant before searching the vehicle.

The Government responds [Doc. 22] that the initial detention of Defendant's vehicle was lawful, as law enforcement had reasonable suspicion that Defendant was engaged in criminal activity through the arranged purchase of methamphetamine from Defendant by a confidential informant ("CI"). Next, the Government asserts that the warrantless search of Defendant's vehicle was then lawful—as there was probable cause to conduct such a search through the identification of suspected methamphetamine in the driver's side door. Additionally, the Government maintains that law enforcement's further search of the vehicle was permissible as a search incident to a lawful arrest.

## II.  SUMMARY OF TESTIMONY

At the January 29 hearing, the Government presented the testimony of former Knox County Sheriff's Office ("KCSO") Detective Nikki Plaza and KCSO Detective Tyler Ballard.  Defendant presented no witnesses.  The Government also introduced the KCSO Incident Report from April 15, 2019 as Exhibit 1; pictures from the search of Defendant's vehicle as Exhibit 2; Nikki Plaza's typed investigatory notes as Exhibit 3; the vehicle registration for Defendant's Chevy Impala as Exhibit 4; Defendant's "NCIC" Criminal History as Exhibit 5; and a satellite image of the Ingles parking lot located at 7466 Oak Ridge Highway as Exhibit 6.  The Court summarizes the witness's testimony and introduced exhibits as follows.

The Government first presented the testimony of Ms. Plaza, who previously worked as a detective for the KCSO before leaving in September of 2019 for a position with Y-12 National Security Complex.  Ms. Plaza began working with the KCSO in October of 2005 and worked in the narcotics unit for approximately ten years.  Ms. Plaza testified that she was familiar with the Defendant through the investigation and resulting arrest in April of 2019.  Ms. Plaza detailed her interaction with a CI on April 8, 2019, who told her that he had been purchasing several ounces of methamphetamine from "Little Lucky," who was later identified as Defendant.  Ms. Plaza stated that the CI told her that Defendant was one of the bigger dealers of methamphetamine in the local area, as well as that he drove a gray Pontiac Grand Am.

Ms. Plaza and the CI arranged a meeting with Defendant on April 11, 2019 at the Shell gas station on Clinton Highway, in order to allow the narcotics unit to investigate where he resided by following his vehicle.  The CI set up the meeting to discuss Defendant's car window, which was broken.  Ms. Plaza testified that she saw a vehicle arrive at the pre-arranged Shell station, and the vehicle was instead identified as a gray Chevy Impala.  When discussing Exhibit 4, Defendant's

3

vehicle registration for a gray 2008 Chevy Impala, Ms. Plaza detailed that law enforcement then ran the license plate number of the Chevy Impala, which was registered to Defendant and linked to his driver's license and photograph. Ms. Plaza testified that the photograph of Defendant looked similar to the individual meeting with the CI at the gas station, and that the CI later identified Defendant's driver's license picture as Little Lucky.

After Defendant and the CI met on April 11, 2019, law enforcement attempted to follow Defendant to his residence, but lost the vehicle within a couple of minutes. Ms. Plaza stated that after she was unable to follow Defendant's vehicle, she arranged with the CI to schedule a time and location to meet with Defendant to purchase methamphetamine. Ms. Plaza then detailed that she also accessed Defendant's TOMIS report when pulling up Defendant's vehicle registration and driver's license information, which revealed that Defendant had previously been placed on probation for drug charges, and thus the sale of methamphetamine would also place Defendant in violation of his state probation.

Next, Ms. Plaza described the details of planning the April 15, 2019 buy. First, Ms. Plaza asked the CI to set up a purchase of methamphetamine from Defendant, as he had done in the past. Ms. Plaza instructed the CI to arrange to meet Defendant in the Ingles parking lot on Oak Ridge Highway because it was an open area in a good location from where the CI and law enforcement were then located. The CI told Ms. Plaza that Defendant had agreed to sell methamphetamine and to go to the meeting location. Ms. Plaza testified that the CI had not previously been used as an informant, but that the information that he was telling her was "checking out," such as the verification that Defendant had a history of selling methamphetamine.

Ms. Plaza also testified that she was informed that Defendant had been in a relationship with Tabetha Davila. She searched Ms. Davila's public Facebook page, and saw pictures of Ms.

4

Davila and Defendant together. Ms. Plaza testified that this coincided with the information that she had received from the CI regarding Defendant and Ms. Davila. Ms. Plaza then pulled Ms. Davila's criminal history, which revealed that she had an active warrant out of another county.

When describing the details of the buy on April 15, 2019, Ms. Plaza testified that she was in contact with the CI, who told her that Defendant had agreed to bring a certain quantity of methamphetamine at the arranged location and time. Ms. Plaza and Detective Ballard then set up inside of and around the Ingles parking lot. Other members of law enforcement were also located in the general area but away from the parking lot. The CI was not present at the Ingles parking lot as it was a "no-show buy." Ms. Plaza explained that in a "no-show buy," an informant is asked to contact their "dealer" and to set up the meeting location. She said the CI's presence at the buy was not required, because law enforcement had already identified the Defendant and his vehicle and the CI had arranged to meet with Defendant at the Ingles parking lot. Additionally, Ms. Plaza was in contact with the CI throughout the day about what time Defendant was expected to arrive.

The Government introduced as Exhibit 6 an aerial view of the Ingles parking lot. Ms. Plaza testified that she was parked in the second or third row from the left towards the Oak Ridge Highway side of the parking lot on the south end, in an attempt to blend in to where she believed employees' vehicles were parked. Ms. Plaza and Detective Ballard were in unmarked vehicles, as well as in plain clothes with a vest that displayed their badge and was marked to indicate the KCSO narcotics unit. Neither detective had dash cam videos in their vehicle or was wearing body cams, and the narcotics unit did not wear body cams at this time.

Ms. Plaza testified that while in the parking lot, she observed a gray Chevy Impala pull into the parking lot and park in the row directly behind her vehicle. Further, she observed two occupants in the vehicle, which she stated looked very similar to Defendant and Ms. Davila. Ms.

5

Plaza then spoke to Detective Ballard and waited for a couple of minutes to see if the driver would exit the vehicle. Ms. Plaza testified that she witnessed both occupants of the vehicle leaned over and moving around inside of the vehicle.

Ms. Plaza stated that shortly after, she then backed out of her parking spot and pulled forward to Defendant's vehicle, activated her flashing blue lights, and parked in front of Defendant's vehicle. Detective Ballard parked his car behind Defendant's vehicle. Ms. Plaza detailed that she saw Detective Ballard approach the driver's side of the vehicle, and therefore she approached the passenger side. After arriving at the passenger side of the vehicle, where Ms. Davila was sitting, Ms. Plaza testified that she heard Detective Ballard mention a gun, so she then had Ms. Davila exit the vehicle to place her in restraints. Ms. Plaza detailed that although she did not see the gun initially, she observed what was believed to be methamphetamine in the front passenger seat and center console of the vehicle.

On cross-examination, Ms. Plaza stated that the CI was not arrested at the time he provided information, but there was the possibility of pending charges. Further, Ms. Plaza detailed that the CI had not previously performed any controlled buys or provided any other information leading to an arrest, and the only other information that he provided was on another individual named "JuJu," who was associated with the Defendant. Ms. Plaza testified that the CI identified a similar vehicle to Defendant's vehicle, and law enforcement was not initially aware of Defendant's address.

When asked to further describe the process of executing a no-show buy, Ms. Plaza explained that the procedure has been effective in the past when law enforcement is not aware of the targeted dealer's location. However, the CI is not present at the location as the CI has already arranged a buy and the target dealer is drawn to a set location. Ms. Plaza testified that physical buys are often required on a state level to obtain a search warrant for a residence, so the

6

investigation did not believe that obtaining a search warrant was the proper method in this case. Additionally, Ms. Plaza stated that not having worked with the CI in this case before, she had the feeling that such an individual may generally be "flaky" and not want to continue working with law enforcement for a longer investigation. Ms. Plaza testified that law enforcement had an agreement with the CI to not bring charges for the conduct stemming from the pending investigation, and she had a sense that the CI would not want to assist in a longer investigation.

With respect to the subject buy, Ms. Plaza testified that while parked in the Ingles parking lot on April 15, 2019, she was facing towards Oak Ridge Highway, and the respective members of law enforcement arrived at the same time. Ms. Plaza pulled into the parking spot facing a swimming pool and residential area. In addition to Detective Ballard, another marked unit was parked further down Oak Ridge Highway. Ms. Plaza testified that she was in the parking lot for approximately fifteen minutes until Defendant parked in the row directly behind where she was parked. Ms. Plaza stated that approximately ten minutes passed from when she saw Defendant's vehicle pull into the parking lot through her rear-view mirror to when she and Detective Ballard approached the vehicle. Ms. Plaza detailed that during this period, Defendant was not speeding, and she did not observe any moving violations. While Ms. Plaza acknowledged that the parking lot was open to the public where people could park for various reasons, she testified that the occupants were not just sitting and waiting, but rather were moving around inside of the vehicle, which raised her awareness "that something could be going on."

Ms. Plaza stated that she then radioed Detective Ballard, who pulled behind Defendant's vehicle, blocking it from the back. At the same time, she backed out of her parking spot and placed her vehicle in front of Defendant's vehicle, explaining that the blue lights on an undercover vehicle are more visible from the front of the vehicle. Ms. Plaza testified that she was unclear whether she

or Detective Ballard left their vehicle first, but that they both approached Defendant's vehicle at around the same time. After approaching the passenger side of the vehicle, Ms. Plaza did not immediately open the door until hearing Detective Ballard mention a gun. Ms. Plaza then removed Ms. Davila from the vehicle and placed her in handcuffs. Ms. Plaza stated that she witnessed Detective Ballard place Defendant in handcuffs and move him away from the vehicle.

Ms. Plaza testified that after other members of law enforcement had arrived, she looked into the vehicle and saw the suspected methamphetamine. Ms. Plaza testified that she did not see Detective Ballard go into the vehicle before she saw the methamphetamine, and the other units arrived shortly after Defendant and Ms. Davila were placed in handcuffs. A marked K-9 unit arrived later to the scene, but Ms. Plaza was unaware of whether the K-9 officer had a dash cam or body cam. However, Ms. Plaza explained that K-9 officers occasionally take their body cams off when dealing with narcotics investigations, in case a suspect offered to cooperate and the K-9 officer was present to assist but was not privy to all details of the investigation. Ms. Plaza detailed that approximately five members of law enforcement were present at the scene.

On re-direct examination, Ms. Plaza stated that while at the Ingles parking lot, she was communicating with Detective Ballard by radio, as well as with the CI on the phone. The CI provided Ms. Plaza with updates on the arranged purchase and his communications with Defendant. Ms. Plaza testified that she was at the particular location at the arranged time because of her conversations with the CI. Ms. Plaza testified that Ingles parking lot was a typical parking lot, and she "for sure" identified Ms. Davila when she approached the vehicle and positively identified the Defendant when she saw him in handcuffs. Ms. Plaza also reiterated that she was aware of the active warrant against Ms. Davila. On re-cross examination, Ms. Plaza stated that

prior to approaching the vehicle, she knew the woman in the vehicle looked very similar to Ms. Davila and matched her physical description and features.

The Government then presented the testimony of Detective Ballard, who has been a detective in the narcotics unit of the KCSO for approximately two years. Detective Ballard testified that he was familiar with Defendant's case through assisting Ms. Plaza, the lead investigator, with the no-show buy. When reviewing the narrative of the Investigative Report of Defendant's arrest, which the Government introduced as Exhibit 1, Detective Ballard testified that the unit was set up along Oak Ridge Highway, with Ms. Plaza parked in the Ingles parking lot. Detective Ballard stated that after Ms. Plaza saw Defendant's vehicle enter the parking lot, he pulled in with his blue lights activated.

Detective Ballard then exited his vehicle, approached the driver's side of Defendant's vehicle "at the center post between the back and front seat," and asked Defendant to step out of the vehicle. Detective Ballard testified that he then asked Defendant if there was anything that he needed to be aware of inside of the vehicle, Defendant stated that there was a gun inside, and turned his body to reach back towards the vehicle. Additionally, Detective Ballard detailed that Defendant was facing him when he started saying that there was a gun inside of the vehicle, before turning toward the vehicle. Detective Ballard then pulled Defendant away from the vehicle. Defendant Ballard testified that he observed a suspected bag of methamphetamine in the bottom compartment on the driver's side door of the vehicle as soon as Defendant opened the door.

The Government introduced as Exhibit 2 several photographs of Defendant's vehicle. Detective Ballard testified that the photographs depict the bag of methamphetamine in the driver's side door that he observed while pulling Defendant out of the vehicle, as well as the firearm between the driver's side seat and center console. Further, Detective Ballard testified that he

9

observed the firearm, as well as scales and another bag of methamphetamine in the center console, when he pulled Defendant out of the vehicle. After Defendant was away from the vehicle, Detective Ballard placed him in handcuffs, while the passenger of the vehicle was simultaneously restrained. Detective Ballard stated that the K-9 officer arrived at the scene around this time, but he did not have a dash or body cam. Detective Ballard testified that he was driving an unmarked vehicle, he activated his blue lights when pulling up behind Defendant's vehicle, and although he was not wearing a uniform, he was wearing a tactical vest which displayed that he was a member of the KCSO narcotics unit. Lastly, Detective Ballard stated that several thousand dollars in cash, around 100 grams of methamphetamine, the firearm, and small amounts of heroin were found within the vehicle.

On cross-examination, Detective Ballard testified that he was only involved in the investigation of Defendant's case while assisting with the no-show buy. Next, Detective Ballard stated that he was parked in a library parking lot across the road before Defendant arrived at the Ingles, and that he did not see Defendant's vehicle arrive at the parking lot. Ms. Plaza then radioed Detective Ballard and directed him to pull in behind Defendant's vehicle, blocking him into the parking space. Detective Ballard testified that he did not notice anything strange about Defendant's vehicle, and although he had seen a picture of Defendant, he had not performed any background investigation. Detective Ballard stated that another member of the narcotics unit, Sergeant Farrell, arrived at the scene when Defendant was exiting the vehicle. Next, Detective Ballard testified that when Defendant turned toward the vehicle, it appeared that Defendant was reaching toward the gun to hand it to him. Detective Ballard stated that the K-9 officer used on the day of the arrest was in training and was not wearing any cameras.

On re-direct examination, Detective Ballard testified that he had seen a picture of Defendant prior to arriving at the parking lot and recognized him when approaching the vehicle. Further, Detective Ballard stated that his questioning to Defendant of whether there was anything that he needed to know about inside of the vehicle was a general investigatory question for his well-being when approaching a vehicle. Lastly, Detective Ballard detailed that the K-9 performed a sniff of the vehicle after he had already seen the suspected firearms and narcotics within Defendant's vehicle.

## III.    FACTUAL FINDINGS

The following factual findings are taken from the testimony at the suppression hearing, as well as the submitted exhibits.

The KCSO narcotics unit began interacting with a CI on April 8, 2019, regarding a potential investigation into Little Lucky, who the CI stated had sold him several ounces of methamphetamine weekly. The CI detailed that Little Lucky drove a gray Pontiac Grand Am. The KCSO narcotics unit and Ms. Plaza then arranged a meeting between the CI and Little Lucky at the Shell gas station on Clinton Highway on April 11, 2019, in an attempt to begin further surveillance.

On April 11, 2019, the CI met with Little Lucky, who arrived in a gray Chevy Impala, at the pre-arranged time and location. Law enforcement attempted to surveil the Chevy Impala after the meeting, but soon lost the vehicle. Law enforcement ran the license plate number of the Chevy Impala, which led to Defendant's driver's license and photograph, and the CI confirmed that the individual he met with was both Little Lucky and the individual in the driver's license picture. Further investigation by law enforcement revealed that Defendant was in a relationship with Tabetha Davila.

11

Ms. Plaza and the KCSO narcotics unit then worked with the CI to arrange a purchase of methamphetamine from Defendant on April 15, 2019, at the Ingles parking lot located at 7466 Oak Ridge Highway. Ms. Plaza arrived at the Ingles parking lot, while Detective Ballard was parked further down Oak Ridge Highway in a library parking lot, and both detectives were in unmarked vehicles. The CI was not present at the Ingles parking lot, but Ms. Plaza was in contact with the CI throughout the day. Ms. Plaza parked in the back-left end of the parking lot towards a residential area.

At approximately 4:31 p.m., Ms. Plaza witnessed the previously identified gray Chevy Impala with two occupants inside of the vehicle pull into the Ingles parking lot. The Chevy Impala parked in the row directly behind Ms. Plaza's vehicle. Ms. Plaza waited approximately ten minutes before radioing Detective Ballard to enter the parking lot. Ms. Plaza then backed out of her parking spot, pulled forward to Defendant's vehicle, and activated her blue lights while Detective Ballard parked his vehicle behind the Chevy Impala.

Detective Ballard approached the driver's side of the vehicle, while Ms. Plaza approached the passenger's side. Detective Ballard asked Defendant to exit the vehicle and if there was anything inside of the vehicle that he needed to be aware of, to which Defendant responded that there was a gun inside of the vehicle, and then turned his body back towards the vehicle. At this time, Detective Ballard pulled Defendant away from the vehicle and placed him in handcuffs. After hearing Detective Ballard mention a firearm, Ms. Plaza removed Ms. Davila, the passenger of the vehicle, from the Chevy Impala and placed her in handcuffs. Other members of law enforcement, including a K-9 unit, also arrived at the scene. The K-9 unit alerted on the vehicle. A resulting search of the Chevy Impala revealed a Ruger handgun between the driver's seat and center console, approximately 93 grams of a substance believed to be methamphetamine,

approximately 10 grams of a substance believed to be heroin, two digital scales with residue, multiple small baggies, and approximately $1,857.00 in cash.

## IV.    ANALYSIS

Defendant seeks to suppress all evidence seized from the alleged illegal search and seizure of his vehicle in the Ingles parking lot on April 15, 2019.  Defendant maintains that both the initial detention of his vehicle, as well as the resulting warrantless search, violated his rights under the Fourth Amendment.  The Court will address Defendant's arguments in turn.

### A.    *Terry* Stop of Defendant's Vehicle

Defendant challenges the initial detention of his vehicle when Ms. Plaza and Detective Ballard positioned their cars to block him into the parking spot.  Defendant asserts that there was no reasonable suspicion to justify the detention of his vehicle, as "[h]e was parked in the parking lot of a grocery store in the afternoon, an area open to the public at large."  [Doc. 21 at 2]. Therefore, Defendant maintains that "[w]hen the officers blocked [him] from driving away, he was seized illegally and was unlawfully detained under Fourth Amendment purposes."  [*Id.*].  Further, Defendant argues that the Government illegally detained him solely based upon the information obtained from a CI who had not previously worked with law enforcement and who Ms. Plaza admitted was "flaky."

The Government concedes that Defendant was detained and seized once Ms. Plaza and Detective Ballard blocked his vehicle within the parking lot.  However, the Government contends that the detention of Defendant's vehicle was lawful because law enforcement had reasonable suspicion that he was engaged in illegal activity.  [Doc. 22 at 3–4].  The Government asserts that such reasonable suspicion was obtained from the information gathered from the CI, the subsequent

13

corroboration of that information, and Defendant arriving at the arranged location for a previously scheduled purchase of methamphetamine.

All seizures—including brief investigatory stops—receive Fourth Amendment protection. *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (citing *United States v. Smith*, 594 F.3d 535, 535 (6th Cir. 2010)). Law enforcement may temporarily seize a person or vehicle, i.e., conduct a *Terry* stop, if the officers have "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officers know at the time of the stop. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) ("[W]here a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances.").

"Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)). Whether reasonable suspicion exists must be evaluated based on the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623; *see also United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008). An officer who decides to conduct a *Terry* stop must be acting on more than his "inchoate and unparticularized suspicion or 'hunch;'" rather, he must rely on "specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to

14

them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (internal citation and quotations omitted).

Ultimately, law enforcement had reasonable suspicion before detaining the vehicle that Defendant was engaged in criminal activity. "Reasonable suspicion need not arise from an officer's direct observation, but can be based on informant tips and dispatcher information." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006). Here, Ms. Plaza had engaged with a CI to schedule a purchase of methamphetamine with Defendant, who the CI had stated was a dealer of methamphetamine. "Specifically, a tip from an identifiable informant who gives reasonably detailed information can provide reasonable suspicion, especially if an investigating officer's own observations contribute to his suspicions." *United States v. Gaston*, 776 F.3d 405, 408 (6th Cir. 2015) (citing *Smoak*, 460 F.3d at 779–80). The CI provided the color and believed model of Defendant's vehicle, and law enforcement subsequently scheduled a meeting between the CI and Defendant in an attempt to further investigate Defendant on April 11, 2019.

Although law enforcement was unable to surveil Defendant, and Defendant drove a Chevy Impala instead of a Pontiac Grand Am as previously identified by the CI, law enforcement pulled the vehicle registration of Defendant's vehicle and corroborated this information. The CI subsequently confirmed that he had regularly purchased methamphetamine from Defendant, and that Defendant was Little Lucky, upon reviewing his driver's license picture. Further, the CI told Ms. Plaza about Defendant's relationship with Ms. Davila, which Ms. Plaza corroborated by reviewing Ms. Davila's public Facebook page. Ultimately, even "[a] tip from an informant 'whose reliability is not established' may support a finding of reasonable suspicion if 'there is some independent corroboration by the police of the informant's information.'" *Bazzi v. City of*

*Dearborn*, 658 F.3d 598, 605 (6th Cir. 2011) (quoting *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000)).

Next, the CI arranged the purchase of methamphetamine from Defendant, at a time and location provided by law enforcement. Ms. Plaza stayed in contact with the CI on the day of the no-show buy. On April 15, 2019, Ms. Plaza observed Defendant's vehicle—identified by the make, model, and license plate number corroborated by the CI—enter the Ingles parking lot at the arranged time. Law enforcement had also previously identified Defendant from his driver's license picture, which the CI stated was Little Lucky after his April 11, 2019 meeting. Ms. Plaza subsequently waited several minutes to see if Defendant planned on entering the grocery store or remaining in his vehicle. Additionally, Ms. Plaza testified that upon seeing Defendant's vehicle enter the parking lot, the two occupants in the vehicle looked very similar to Defendant and Ms. Davila.

The Court finds that law enforcement had at least reasonable suspicion before detaining Defendant's vehicle that he was engaged in criminal activity and, further, may have been in the possession of contraband. The CI had arranged the purchase of methamphetamine from Defendant, the police corroborated the information obtained from the CI, and Defendant arrived at the pre-arranged location and time. Accordingly, it was reasonable to conduct a brief, investigatory stop of Defendant's vehicle.

### B. Search of Defendant's Vehicle

Defendant also challenges the resulting search of his vehicle after the initial detention. Defendant maintains that "[t]he officers articulated no probable cause that evidence of a crime or contraband would be found in the vehicle" [Doc. 21 at 3], and instead based the detention and resulting search of Defendant's vehicle upon information obtained from a first-time informant.

16

Defendant submits that law enforcement should have continued their investigation and obtained a search warrant.

The Government responds that the search of Defendant's vehicle was valid as a search incident to a lawful arrest. The Government argues that Detective Ballard's observation of the methamphetamine within the front driver's side door, as well as a firearm, scales, and additional bag of methamphetamine in the center console, while removing Defendant from the vehicle, constituted probable cause to arrest Defendant, and thus law enforcement could search the entire vehicle as incident to a lawful arrest. Additionally, the Government asserts that Detective Ballard could seize the methamphetamine within the driver's side door as it was in plain view—providing another basis to search Defendant's vehicle.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. To comport with the Constitution, searches must be pursuant to a warrant, which "shall issue [only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* The Supreme Court has instructed that assessing the reasonableness of a warrantless search must begin with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal footnote omitted). The Court will review the various exceptions to the warrant requirement for searches under the Fourth Amendment that render the search of Defendant's vehicle lawful.

### 1. Automobile Exception

One exception to the warrant requirement concerns searches of vehicles, where the Supreme Court has stated that "[e]ven in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." *California v. Carney*, 471 U.S. 386, 391 (1985). Pursuant to the automobile exception, law enforcement may conduct a warrantless search of a vehicle if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal citations omitted). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (quoting *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir.), *cert. denied*, 512 U.S. 1243 (1994)). "The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074-75 (6th Cir. 1998)).

First, law enforcement had probable cause to believe that contraband or evidence of a crime would be found in Defendant's Chevy Impala. At the time of the search, Ms. Plaza and Detective Ballard had probable cause to believe that evidence of the crime of methamphetamine distribution was present within the vehicle. Law enforcement had utilized a CI to meet with the Defendant and identify him as Little Lucky, subsequently corroborated this information through reviewing Defendant's vehicle registration with the CI, and arranged a purchase of methamphetamine from the Defendant. Ms. Plaza then witnessed Defendant's vehicle, previously identified by the CI, enter the Ingles parking lot at the arranged time. After the Defendant informed Detective Ballard

that he had a gun inside of the vehicle, and turned back toward the gun, Detective Ballard testified that he observed and identified the suspected bag of methamphetamine in the bottom compartment on the driver's side door of the vehicle as soon as Defendant opened the door.

Therefore, the Court finds that law enforcement had probable cause to suspect that Defendant's vehicle contained contraband and evidence of drug trafficking, and thus conducted a valid warrantless search pursuant to the automobile exception. *See United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) ("At the time police stopped and searched Arnold's vehicle, they had probable cause to believe Arnold's car contained contraband and were, therefore, justified in their warrantless search."); *United States v. Turner*, No. CR 18-53-DLB-CJS-1, 2019 WL 2814648, at *5 (E.D. Ky. July 2, 2019) ("Put simply, the officers' first-hand observation of phone calls arranging a controlled buy, the verification of the details discussed during those calls, and West's act of transporting drugs to the proposed drug deal created probable cause to search the vehicle West was traveling in.").

### 2. Search Incident to Lawful Arrest

Additionally, as argued by the parties, the search of Defendant's vehicle was lawfully conducted as a search incident to an arrest. "When police actions go beyond checking out the suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause." *United States v. Obasa,* 15 F.3d 603, 607 (6th Cir.1994). "At the same time, 'the use of guns, handcuffs, and detention . . . do[es] not automatically transform a *Terry* stop into an arrest'; rather, the officers' 'displays of force must be warranted by the circumstances.'" *United States v. McElrath*, 786 F. App'x 575, 581 (6th Cir. 2019) (quoting *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015)). "Such 'intrusive measures are warranted' if, for example, 'specific facts lead to an inference' that the suspect poses a risk 'of

19

violence to the officers.'" *Id.* "These 'specific facts' can include information supporting 'a reasonable belief that the suspect is armed and dangerous.'" *McElrath*, 786 F. App'x at 581–82 (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 835 (6th Cir. 2005)).

Initially, the Court finds that Detective Ballard was justified in restraining Defendant in handcuffs, as Defendant stated that he had a gun inside of the vehicle and then turned to reach towards the gun. Detective Ballard testified that when he pulled Defendant away from the vehicle, he first noticed the bag of methamphetamine in the driver's side door, as well as scales, a firearm, and another bag of methamphetamine in the center console of the vehicle. Defendant does not challenge when the investigatory stop was transformed into an arrest, and the Court regardless finds that law enforcement had probable cause to arrest Defendant. Therefore, law enforcement could also validly search Defendant's vehicle as a search incident to a lawful arrest.

"Under Sixth Circuit law, it is well-established that a confidential informant's tips to law enforcement—when shown to be substantially corroborated—are sufficient to establish probable cause." *United States v. McCloud*, No. CR 18-23-DLB-CJS, 2018 WL 5046063, at *3 (E.D. Ky. Oct. 17, 2018) (citing *United States v. Strickland*, 144 F.3d 412, 417 (6th Cir. 1998)). Prior to detaining and arresting Defendant, law enforcement "knew of several significant incriminating circumstances suggesting that [he] was involved in narcotics trafficking, and the totality of these factors would lead a reasonable person to determine that there was a reasonable probability that illegality had occurred or was about to occur." *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006).

As the Court has already detailed, law enforcement had confirmed the identity of the Defendant as Little Lucky through the CI, along with his vehicle—a gray Chevy Impala. The CI stated that he had previously bought methamphetamine from Defendant. Ms. Plaza then had the

CI arrange to purchase methamphetamine from the Defendant at a pre-arranged location, the Ingles parking lot. The CI was in contact with Ms. Plaza throughout the day on April 15, 2019 regarding Defendant's arrival time. Ms. Plaza then observed Defendant arrive at the scheduled time and location, in his gray Chevy Impala. Additionally, Ms. Plaza testified that the individuals in the gray Chevy Impala looked very similar to both Defendant and Ms. Davila. *See United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012) ("Here, the police corroborated key elements of [the CI] Holmes's tip: the color and make of the car Gill was driving and the location of the arranged drug sale. The police also heard Holmes's end of the phone conversation in which Holmes arranged to meet Gill for a drug deal, and debriefed Holmes immediately following the call to ascertain what Gill had said. For these reasons, probable cause to arrest Gill existed at the time of his arrest."); *see, e.g.*, *McCloud*, 2018 WL 5046063, at *3 ("Specifically, the Sixth Circuit has repeatedly held that probable cause exists when an informant describes the details of a drug transaction that is to take place in the future, and those details are then independently observed by police officers.") (internal citations omitted).

"Other factors are relevant to evaluating the reliability of the informant, including whether the informant made statements against his/her own penal interest, and how well the informant can show that he knows the identity of the suspect." *Id.* at *4 (citing *United States v. Dickens*, 748 F. App'x 31, 37 (6th Cir. 2018)). Here, while the CI was not charged with a crime at the time of his cooperation, and he had not previously been used as an informant, the information provided was sufficiently corroborated to establish his reliability. Further, although the CI originally misstated the make and model of Defendant's vehicle, he subsequently identified Defendant after meeting with him through Defendant's vehicle registration and driver's license picture.

Additionally, the fact that law enforcement did not witness Defendant engage in "any actual illegality" does not alter the probable cause analysis. *See United States v. Strickland*, 144 F.3d 412, 417 (6th Cir. 1998) (holding a sufficiently corroborated tip from an informant supported probable cause even though the police did not witness any illegality). The "Fourth Amendment does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect." *Id.* at 415. Moreover, "[n]or does it matter that the drug transaction between the Informant and the Defendant 'never took place.'" *United States v. Gaither*, No. 17-15-DLB-CJS, 2018 WL 1033457, at *6 (E.D. Ky. Feb. 22, 2018)) (quoting *United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012)). "The law does not require that an illegal act be completed for sufficient probable cause to develop; it merely requires the existence of 'facts that . . . could lead a reasonable person to believe that an illegal act has occurred or is about to occur.'" *Gill*, 685 F.3d at 610 (quoting *Strickland*, 144 F.3d at 416). Accordingly, the Court finds that law enforcement had probable cause to arrest Defendant.

Further, "a formal custodial arrest need not precede the search as long as the formal arrest follows 'quickly on the heels of the challenged search' and the 'fruits of that search are not necessary to sustain probable cause to arrest.'" *United States v. McCraney*, 674 F.3d 614, 619 (6th Cir. 2012) (quoting *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004)); *see also United States v. Dotson*, 246 F. App'x 897, 903 (6th Cir. 2007) (holding that though the district court was concerned that the search occurred before the defendant's arrest, "so long as [the officer] had probable cause to arrest the defendant, no formal custodial arrest was necessary before a search incident to arrest could occur").

Therefore, as law enforcement had probable cause to arrest Defendant, the Court must also analyze whether law enforcement validly searched Defendant's vehicle as a search incident to a

lawful arrest. The Court has already detailed that the search of Defendant's vehicle was supported by probable cause, but the search was also permissible as a search incident to a lawful arrest.

In *Arizona v. Gant*, the Supreme Court found that law enforcement may search a vehicle incident to a lawful arrest "when it is reasonable to believe evidence relevant to the crime of arrest may be found in the vehicle." 556 U.S. 332, 343 (2009). In *Gant*, the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or if it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351. Although Defendant was not "unsecured and within reaching distance of the passenger compartment at the time of the search," *id.* at 343, law enforcement reasonably believed that Defendant's vehicle contained evidence of drug trafficking. As the Court has extensively detailed, Ms. Plaza had arranged the purchase of methamphetamine from Defendant through a CI, and Defendant arrived at the arranged location and time. The search of Defendant's vehicle was thus permissible as a search incident to a lawful arrest. *See United States v. Latham*, 763 F. App'x 428, 430–31 (6th Cir. 2019) (finding under *Gant* that law enforcement properly searched defendant's vehicle incident to his arrest, although the he was detained in a patrol car, because it was reasonable to believe that the vehicle contained evidence relevant to his arrest).

### 3. Plain View

Lastly, although the Court has already found that the search of Defendant's vehicle was permissible pursuant to both the automobile exception and as a search incident to a lawful arrest, the Court also notes that the warrantless search would also be permissible pursuant to the plain view exception.

23

In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)). "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008)).

"[T]he 'plain view' doctrine requires that the criminality of the articles before the officers be 'immediately apparent.'" *United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Determining whether an item is immediately incriminating "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.) (quoting *Texas v. Brown*, 460 U.S. 730, 741–42 (1983); *Payton v. New York*, 445 U.S. 573, 587 (1980) (emphasis omitted)), *cert. denied* 522 U.S. 925 (1997). In assessing whether the incriminating character of an item was immediately apparent, the Court may look to "whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity[.]" *Id.* (citing *United States v. Beal*, 810 F.2d 574, 576–77 (6th Cir. 1987)).

Here, the Court has already detailed that Detective Ballard lawfully detained Defendant when Defendant turned towards his vehicle after responding that he had a firearm inside of the vehicle. Detective Ballard testified that he originally observed a bag of methamphetamine in the

driver's side door, as well as scales, the firearm, and another bag of methamphetamine in the center console, when pulling Defendant out of the vehicle. Ms. Plaza also testified that when she had Ms. Davila exit the vehicle, she observed what she believed to be methamphetamine in the front passenger seat and center console of the vehicle. Therefore, the Court finds that the methamphetamine, as well as firearm and scales, was within plain view and immediately incriminating due to the developed probable cause that Defendant was engaging in narcotics trafficking. Detective Ballard and Ms. Plaza lawfully seized Defendant, and the methamphetamine and firearms were easily seen from the outside of the vehicle. Accordingly, the Court finds that the plain view doctrine provides another permissible basis for the warrantless search of Defendant's vehicle.[1]

---

[1] Additionally, as the Court has detailed several permissible bases for the warrantless search of Defendant's vehicle, the Court will not address the resulting alert by the K-9 unit on the Chevy Impala.

## V.     CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that no Fourth Amendment violation occurred in this case, and law enforcement had reasonable suspicion to briefly detain Defendant, as well as probable cause to conduct a warrantless search of his vehicle.  Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 17**] be **DENIED**.[2]

Respectfully submitted,

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

26